**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JAKEEM TOWLES** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO. 15-4256** |
| | : | |
| **SECRETARY JOHN E. WETZEL**, *et al.* | : | |

## <u>MEMORANDUM</u>

**KEARNEY, J.**                                                                                      **April 15, 2025**

We expect lawyers defending persons charged with first-degree murder will present evidence supporting good faith defenses grounded in the law. The charged person's constitutional right to a sufficient defense includes being represented by a lawyer aware of the governing law even if it is his first capital murder trial. We today evaluate a trial representation on habeas review which the Commonwealth and the convicted man agree is permeated by trial counsel's confusion in choosing a voluntary manslaughter defense strategy but arguing against elements of voluntary manslaughter and adducing evidence contrary to the defense and for impermissible uses.

A twenty-year-old intoxicated man admitted shooting another person after an evening of drinking and drug use. He shot towards the victim (and others) minutes after an altercation involving the victim. No one disputed he shot and killed the victim. Trial counsel could have chosen to argue the jury should return a third-degree murder conviction which he could show through evidence of the young man's extreme intoxication and inability to form specific intent to kill. This is the only allowable use of intoxication evidence in a murder case under Pennsylvania law. Trial counsel instead chose a voluntary manslaughter defense requiring he persuade the jury his client killed the victim with intent but based on a provocation. But trial counsel inexplicably offered intoxication evidence in support of his voluntary manslaughter defense strategy, arguing

intoxication would make his client more easily provoked and more likely to shoot. He also argued his client did not have specific intent to kill, despite the governing law requiring a jury must find specific intent to convict of voluntary manslaughter. Trial counsel presented evidence eliminating the jury's ability to find as he argued. The jury convicted the young man of first-degree murder and recommended the death penalty. He unsuccessfully appealed through a newly appointed lawyer. He then twice sought post-conviction relief, but his post-conviction counsel did not argue trial counsel did not know the governing law. The state courts commented on the disconcerting trial defense strategy in dicta but did not grant relief because the post-conviction counsel did not present the trial lawyer's plain confusion as a ground for ineffective assistance.

The young man then moved for habeas relief through the Federal Defender Office arguing, among several grounds, lawyer confusion or ignorance led to ineffective assistance by presenting substantial evidence of intoxication and arguing against intent when a jury must find intent to convict on a voluntary manslaughter defense. The Commonwealth concedes the trial lawyer might have been confused. We find trial counsel did not provide the jury with the tools to find guilt of a lesser charge based on the lawyer's repeated submitted evidence which did not apply under long-standing Pennsylvania law.

The young man's post-conviction counsel did not raise this lawyer ignorance/confusion argument in post-conviction proceedings. He defaulted on his claim of lawyer confusion which would preclude pursuing this claim today in habeas. But we excuse his default based on his post-conviction counsel's ineffective assistance during post-conviction proceedings in not arguing trial counsel's plainly evident deficient performance. We find ample evidence of the trial counsel's deficient performance and prejudice. We grant his habeas petition requiring the Commonwealth release him from custody unless he is tried again within six months.

I.      **Relevant facts adduced from the state court record**.

Twenty-year-old Jakeem Lydell Towles and Antwain Robinson took a bus from Lancaster, Pennsylvania to Columbia, Pennsylvania to visit Mr. Towles's cousin, Tyrone Hunter, and to attend a local rap performance at the Mighty Dog Family Fun Center near Mr. Hunter's apartment on May 7, 2010.[1] Mr. Towles and Mr. Robinson drank liquor and smoked marijuana throughout the evening, walking between Mr. Hunter's apartment, another venue, and the Mighty Dog multiple times.[2] Mr. Towles took Mr. Hunter's handgun and stashed it in a nearby alley at some time during the evening.[3]

Cornell Stewart and John Wright rapped together as one of the performances at the Mighty Dog.[4] Mr. Towles interrupted their rap performance by taking the microphone from Rappers Stewart and Wright to say the Lancaster area code into the microphone.[5] Rapper Wright then assaulted Mr. Towles and struck him in the head repeatedly.[6] Security separated them and escorted Mr. Towles and Mr. Robinson out the front door.[7] Security escorted Rappers Wright and Stewart out the back door.[8] Mr. Towles then retrieved Mr. Hunter's handgun he earlier stashed in the alley.[9] Mr. Hunter separately walked out of the Mighty Dog and called Messrs. Towles and Robinson, who then walked back towards him.[10] A person standing behind the Mighty Dog recognized Mr. Towles and/or Mr. Robinson and said "there they go right there."[11]

Mr. Towles then fired three gun shots from Mr. Hunter's gun in the direction of Rappers Wright and Stewart.[12] One of the three shots struck Rapper Stewart in the head causing his death.[13]

Messrs. Towles and Robinson fled the scene and got a ride back to Lancaster.[14] During the car ride Mr. Towles made incriminating statements to the driver, Mr. Robinson, and two other women in the vehicle.[15]

*The jury finds Mr. Towles guilty of first-degree murder.*

Mr. Towles turned himself in to the Lancaster City Police Department three days after shooting Rapper Stewart and trying to shoot Rapper Wright.[16] The Commonwealth charged Mr. Towles with the homicide of Cornell Stewart and the attempted homicide of John Wright.[17]

The Honorable Howard F. Knisely presided over a homicide jury trial between May 7 and May 11, 2012 in the Court of Common Pleas of Lancaster County.[18] The Commonwealth filed a notice of aggravating circumstances and an intent to seek the death penalty.[19] Judge Knisely appointed Trial Counsel Sam Encarnacion, who had never tried a capital case before, and penalty phase counsel Patricia Spotts of the Lancaster County Public Defender's Office.[20]

Trial Counsel faced a fact problem: no person disputed Mr. Towles shot Rapper Stewart outside the Mighty Dog on May 7, 2010 leading to death. The question at trial became why Mr. Towles shot towards the rapper including circumstances and events surrounding the incident. Trial Counsel sought to avoid a first-degree murder conviction—and the potential for a death penalty— by pursuing a voluntary manslaughter defense which requires "(1) provocation on the part of the victim, (2) that a reasonable man who was confronted with the provoking events would become 'impassioned to the extent that his mind was incapable of cool reflection,' and (3) that the defendant did not have sufficient cooling off time between the provocation and the killing."[21] It is hornbook Pennsylvania law a "necessary element of . . . voluntary manslaughter is the Specific intent to kill."[22]

But Trial Counsel pursued a voluntary manslaughter theory Mr. Towles was so drunk and high his emotions were heightened, and he was more reactive (an impermissible use of intoxication evidence in a murder trial) while simultaneously arguing Mr. Towles did not possess the specific intent to kill (a necessary element of voluntary manslaughter). Trial Counsel began his presentation

by reading the definitions of first-degree murder and voluntary manslaughter from Pennsylvania Title 18 as part of a rambling opening statement.[23] He never mentioned third-degree murder, which is the traditional use of intoxication evidence and is a lesser included offense without a specific intent finding which also would not involve a potential death sentence. Trial Counsel relied entirely on his chosen trial strategy of seeking a voluntary manslaughter finding. He promised evidence from various witnesses would establish Mr. Towles's drunkenness.[24] Trial Counsel briefly described the unprovoked nature of the rappers' attack on Mr. Towles and the severity of the beating he took from the rappers inside the Mighty Dog.[25] Trial Counsel then, again, returned to evidence of Mr. Towles's drunkenness and highlighted Mr. Towles's marijuana use.[26]

Trial Counsel followed this strategy through trial by unsuccessfully seeking to establish Mr. Towles's drunkenness to the detriment of establishing other evidence.[27] For example, Trial Counsel sought to admit an expert report from Lawrence J. Guzzardi, M.D., his only expert witness, detailing Mr. Towles's drug and alcohol consumption.[28] Dr. Guzzardi's report relied almost entirely on hearsay statements from the non-testifying Mr. Towles. The Commonwealth moved in limine to exclude Dr. Guzzardi's report and preclude his opinion derived from Mr. Towles's statements.[29] The trial court granted the Commonwealth's motion and limited Dr. Guzzardi to hypotheticals.[30] So, Trial Counsel could not present his only expert testimony based on his decision to rely on intoxication evidence to persuade the jury to find Mr. Towles guilty of voluntary manslaughter. Trial Counsel then proceeded to elicit nearly useless expert testimony concerning intoxication. Trial Counsel did adduce testimony suggesting alcohol could make an individual more reactive.[31]

Trial Counsel presented an alarmingly brief and largely incoherent closing argument. He began:

> [Counsel for the Commonwealth] told you in his opening statement that this was not a case of voluntary manslaughter. And he gave you a classic example, textbook example, black letter law example of voluntary manslaughter. A husband walks in and finds his wife -- this is an old example still used. Might not be the most politically correct example anymore. But the husband walks in and finds his wife in some kind of illicit action with somebody else and does something. That's a no-brainer voluntary manslaughter. Can you see that? Can you view it? Can you feel it? The husband walks in, sees his wife, sees another individual, a lover. He does not notice. Walks over to a room. Opens a safe. Takes a gun. Goes in and shoots both of them. That's the reality of voluntary manslaughter. Can you see it now? That's the example he gave you as to why this case is not voluntary manslaughter. You know, I came here when I was five years old – I'm gonna get emotional. I'm an emotional person and the older I get, the more emotional I get. Please do not let that influence you. It's just who I am.[32]

Trial Counsel never explained what he meant to communicate by recalling the infidelity-murder vignette and or why he suddenly referred to his own childhood. He never returned to his chosen voluntary manslaughter defense in his closing. He instead claimed the Commonwealth was "suggesting that there's no other reason for this to happen other than he intended to kill this individual. That's it. Just the specific intent to kill and that's it. No other explanation exists for this. No other explanation exists."[33] Trial Counsel then discussed the assault and provocation of Mr. Towles and explained a time he himself was assaulted.[34] Trial Counsel then argued Mr. Towles was drunk on the night of the incident.[35] But he did not explain how drunkenness went to his chosen defense of voluntary manslaughter.

Trial Counsel then argued the Commonwealth "wants you to think. And that's what first degree murder is. He's gonna tell you that as he shot, he had the specific intent to kill. Fully formed specific intent to kill. Fully formed. Fully formed. That's what I want to do. That's what I want to do. Fully formed. Nothing else."[36] Again, Trial Counsel did not complete the thought, tie this idea

to a voluntary manslaughter defense, or explain to the jury how to connect the evidence presented to the charged offenses. Trial Counsel concluded his brief closing by arguing Mr. Towles was not doing "what he wanted to do" the night of Mr. Stewart's death.[37]

Trial Counsel focused his trial strategy on trying to persuade the jury to find his client guilty of voluntary manslaughter by offering evidence relating almost exclusively to Mr. Towles's alcohol and drug intoxication. Counsel and witnesses mentioned drunkenness, alcohol, and intoxication over one hundred times during trial. In contrast, they mentioned manslaughter less than ten times. They mentioned "voluntary" less than ten times. They mentioned "passion" just three times. The word "heat"? Just once. Most staggeringly, despite most of the evidence advanced by Trial Counsel going to intoxication, Trial Counsel himself did not mention third-degree murder a single time throughout the trial. He chose one defense: Mr. Towles is guilty of voluntary manslaughter.

Judge Knisely read the Pennsylvania Suggested Standard Criminal Jury Instructions on first-degree murder, third-degree murder, and voluntary manslaughter following the closing arguments.[38] Judge Knisely defined voluntary manslaughter as "an intentional killing for which malice is not proven because of passion or provocation."[39] Judge Knisely instructed the jury in order to find Mr. Towles guilty of voluntary manslaughter, they must first find the Commonwealth proved beyond a reasonable doubt Mr. Towles "had the intent to kill."[40] So, the jury would need to find Mr. Towles had the intent to kill even though his lawyer argued he could not form intent. And Judge Knisely instructed the jury voluntary intoxication evidence is permitted to negate the specific intent to kill and a successful defense "may reduce a murder of the first degree charge to a third degree, but no lower."[41] Judge Knisely instructed the jury should "consider at the outset the most serious form of the offense with which the defendant has been charged" and told the jury to

consider first-degree murder and only move on to the consideration of third-degree murder if they had not found Mr. Towles guilty of first-degree murder, and should only consider voluntary manslaughter if they found Mr. Towles not guilty of third-degree murder.[42]

The jury sent out two notes during deliberations asking Judge Knisely to clarify the degrees of murder.[43] The jury first requested a copy of the definitions of first- and third-degree murder, to which Judge Knisely responded, "no."[44] The jury then sent a second note asking Judge Knisely to "re-read the differences between first and third-degree murder[], which means the entire charge on first and third and all of the parts."[45] Judge Knisely reread his instructions on first- and third-degree murder and voluntary intoxication and reiterated voluntary intoxication cannot reduce a murder to voluntary manslaughter.[46]

The jury ultimately convicted Mr. Towles of first-degree murder and attempted homicide.[47]

### *The jury found a basis to sentence Mr. Towles to the death penalty.*

The Commonwealth acknowledged the jury in the penalty phase did not face a traditional first-degree murder case, stating "this might not be the traditional case of premeditation . . . [it is not a case] where somebody has planned out or hired a hitman or done some significant investigation or lying in wait[.] . . . [I]t's not one of those traditional types of cases that you would think about outside of this room."[48]

The jury found one aggravating circumstance and multiple mitigating circumstances.[49] Although one or more jurors found various factors relating to the circumstances of the offense and Mr. Towles's character and criminal history supported the "catch-all" mitigator, the jury unanimously sentenced Mr. Towles to death.[50]

Judge Knisely formally imposed the sentence on June 11, 2012.[51] He sentenced Mr. Towles to death for first-degree murder and to confinement in a state correction facility for a period of not

less than eight and no more than twenty years to run consecutively to the death penalty.[52] Judge Knisely accepted the Commonwealth's motion to nolle pros the severed gun charge.[53]

Mr. Towles moved for post-sentence modification of his sentence to life imprisonment by arguing the jury failed to check the blank on the verdict slip indicating the aggravating circumstance outweighed the mitigating circumstances.[54] Judge Knisely denied the motion and held the jury meaningfully balanced the factors on July 18, 2012.[55]

### Mr. Towles's unsuccessful appeal of his conviction and sentence.

Mr. Towles appealed on six claims of error regarding suppression of prior bad act evidence, jury selection, exclusion of certain expert testimony, jury instructions, and the jury's bases for imposing the death penalty.[56] On September 22, 2014, the Pennsylvania Supreme Court affirmed the convictions and death sentence.[57] On March 2, 2015, the United States Supreme Court denied Mr. Towles's petition for a writ of certiorari.[58]

### Mr. Towles's unsuccessful petition for post-conviction relief.

On June 18, 2015, Mr. Towles pro se petitioned for post-conviction relief in the Lancaster County Court of Common Pleas.[59] "Counsel was initially appointed and, following several extensions of time for the filing of an amended petition, was subsequently substituted twice with [Teri B. Himebaugh] ultimately filing an amended petition on November 18, 2016."[60] The petition raised several ineffective assistance claims different from the claim presently before us and challenged the constitutionality of the death penalty as applied to Mr. Towles.[61]

Post-Conviction Counsel Himebaugh's arguments, to the extent she made merits arguments, followed a heat of passion theory.[62] Post-Conviction Counsel retained Dr. Gerald Cooke, who had previously been involved with the case and testified "he had diagnosed [Mr. Towles] with chronic persistent depression, drug dependency, alcohol abuse, and personality

disorder with antisocial and paranoid features . . . [and Mr. Towles] manifested substantial difficulties with perceptual reasoning and processing speed[.]"[63] Dr. Cooke further testified Mr. Towles would "perceive even common criticisms as an attack" and feel like he needed to respond.[64] Dr. Cooke admitted he would have been willing to testify at Mr. Towles's trial and penalty phases if asked.[65]

Trial Counsel testified, at the time of his representation of Mr. Towles, he worked both as a "part-time public defender" and a private practitioner.[66] Representing Mr. Towles was his first ever capital case.[67] Trial Counsel testified he advised Mr. Towles not to testify about his drug and alcohol use because they were not pursuing a third-degree murder defense and instead "were arguing heat of passion" with drugs and alcohol being "a multiplier effect in the way he felt."[68] This attempted use of intoxication evidence does not comport with Pennsylvania law.

Trial Counsel also did not know specific intent was an element of voluntary manslaughter. Post-Conviction Counsel asked him at the post-conviction hearing if whether Mr. Towles was capable of forming the specific intent to kill was "a controlling issue with regard to heat of passion[.]" Trial Counsel answered: "You're asking a tough legal question now. You have to -- you have to have formed the specific intent to kill with respect to first degree. You have to intend your conduct with regard to voluntary manslaughter. Some DAs argue it's the same. I don't think it's the same."[69] His sworn answer demonstrates patent misunderstanding of the elements of voluntary manslaughter under Pennsylvania law.

Judge Knisely issued an Opinion and Order denying post-conviction relief on October 3, 2018.[70] Mr. Towles timely appealed.[71] The Pennsylvania Supreme Court affirmed the denial on May 31, 2019.[72] The Pennsylvania Supreme Court stated the proposition Mr. Towles lacked specific intent was "irreconcilably inconsistent with . . . the [voluntary manslaughter] defense

asserted at trial."[73] The Pennsylvania Supreme Court further noted there were "conceptual problems with [Mr. Towles]'s arguments, tracing to the defense theory at trial."[74]

### Mr. Towles petitions for habeas relief.

Mr. Towles petitioned for habeas relief on twenty-two separate grounds on August 11, 2015.[75] We appointed counsel and stayed Mr. Towles's execution.[76] We stayed his petition and granted him leave to pursue a second post-conviction relief petition in Pennsylvania state court.[77]

Mr. Towles filed his second post-conviction relief petition on May 4, 2020.[78] Mr. Towles claimed the Commonwealth made threats and promises to witness Mr. Robinson to induce him to testify against Mr. Towles at trial and violated *Brady v. Maryland* and its progeny by failing to disclose the information.[79] The trial court denied the petition.[80] The Supreme Court affirmed the decision on August 22, 2023, holding Mr. Towles's second petition untimely and without merit.[81]

## II.    Analysis

We turn to Mr. Towles's ripe petition for habeas relief. Mr. Towles raises twenty-two different grounds for habeas relief at various levels of exhaustion. We begin by analyzing his first ground: Trial Counsel was ineffective for presenting a voluntary manslaughter defense but failing to conduct basic research on the topic, which led him to argue against the intent element of voluntary manslaughter and attempt to improperly use intoxication evidence in support of the voluntary manslaughter defense. The Commonwealth argues this ineffective assistance of trial counsel claim is procedurally defaulted and, even if not, we could not find ineffective assistance because Trial Counsel's "confusion" did not prejudice Mr. Towles. We welcomed thoughtful oral argument on this claim.

We find: (1) the claim of lawyer confusion is procedurally defaulted; (2) default is excused because post-conviction relief counsel was ineffective in not asserting this plainly evident

deficiency; and (3) Mr. Towles demonstrated trial counsel's performance was ineffective under the two-pronged *Strickland* test because Trial Counsel was so confused about basic Pennsylvania criminal law he effectively chose not to present a viable defense strategy.[82]

### A. Mr. Towles's claim on Trial Counsel's ineffectiveness based on theory not grounded in the law is unexhausted and procedurally defaulted.

The Commonwealth argues Mr. Towles's ineffectiveness claim based on lawyer confusion is unexhausted and procedurally defaulted. Mr. Towles admits the default but argues it can be excused. We agree with Mr. Towles.

We may not grant a habeas petition to "a person in custody pursuant to the judgment of a State court . . . unless . . . the applicant has exhausted the remedies available in the courts of the State [.]"[83] This principle requires "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process."[84] "In Pennsylvania, petitioners afford the state courts that opportunity by fairly presenting their claims to the Superior Court, either on direct review or on appeal of a petition under Pennsylvania's [post-conviction relief statute]."[85] "To fairly present a claim, a petitioner must introduce both the legal theory and its underlying factual support."[86]

Mr. Towles never raised his current ineffective assistance claim in state court, so he "waived" his argument.[87] Mr. Towles did not fairly present this claim to the state court using Pennsylvania's applicable claim-preservation rules and Mr. Towles is now precluded from returning to the state court to exhaust this claim, so this claim is deemed procedurally defaulted for habeas purposes.[88]

**B. We excuse Mr. Towles's procedural default.**

The Commonwealth argues we cannot excuse the default of this ineffective assistance based on lawyer confusion claim because it is not substantial enough. Mr. Towles argues Trial Counsel's confusion was so apparent, post-conviction relief counsel performed deficiently. We agree with Mr. Towles.

As a general rule, we do not review procedurally defaulted claims.[89] But this prohibition can be overcome. We may review defaulted claims if the petitioner can show "'cause' to excuse his failure to comply with the state procedural rule and 'actual prejudice resulting from the alleged constitutional violation.'"[90]

The Supreme Court recognized a dozen years ago in *Martinez v. Ryan*, "[i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial."[91] Under *Martinez* "[w]here, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective."[92]

Sufficient cause exists to review a defaulted claim for ineffective assistance of counsel under *Martinez* if the petitioner shows "(a) the default was caused by ineffective assistance of post-conviction counsel . . . (b) in the initial-review collateral proceeding (i.e., the first collateral proceeding in which the claim could be heard) and (c) the underlying claim of trial counsel ineffectiveness is 'substantial[.]'"[93] If we find *Martinez* excuses the procedural default, we may "consider the merits of a claim that otherwise would have been procedurally defaulted."[94]

We first examine whether Post-Conviction Counsel caused the procedural default by failing to raise it in the post-conviction relief petition in state court. Mr. Towles must show Post-Conviction Counsel's failure constitutes deficient performance under the first prong of *Strickland*, meaning Post-Conviction Counsel's representation fell below an objective standard of reasonableness.[95] We find Post-Conviction Counsel's representation was objectively unreasonable because she did not raise a claim for ineffective assistance predicated on lawyer confusion. Post-Conviction Counsel had no strategic reason for failing to raise trial counsel's obvious confusion in the post-conviction relief proceeding. As detailed above, the trial transcripts demonstrate Trial Counsel presented weak evidence in support of a third-degree murder intoxication defense and disputed Mr. Towles had intent (a required element of voluntary manslaughter) but professed to be advancing a voluntary manslaughter defense.[96] Trial Counsel did not establish the elements of a voluntary manslaughter heat of passion defense and instead focused his efforts on intoxication evidence.[97] Trial Counsel called a single expert at trial who testified only on the hypothetical effect of alcohol and drug consumption on the body.[98] Post-Conviction Counsel's failure to act is even more striking when one considers she questioned Trial Counsel herself and elicited answers which clearly demonstrated his misunderstanding of Pennsylvania law.[99]

The second prong of the test is met where, as here, Post-Conviction Counsel failed to raise the ineffective assistance of trial counsel claim in the initial post-conviction relief petition. There is no dispute Post-Conviction Counsel did not do so.[100]

The third prong of the test is satisfied where Mr. Towles demonstrates the underlying ineffectiveness of Trial Counsel is "substantial," meaning it has "some merit."[101] "[T]he question, for *Martinez* purposes, is merely whether reasonable jurists could debate" Mr. Towles's underlying ineffective assistance claim "has merit, or whether the claim is 'adequate to deserve

encouragement to proceed further.'"[102] As our Court of Appeals in *Preston* noted: "It could be that the need for a showing of prejudice at the *Martinez* stage might rise and fall depending upon the strength of the [ineffective assistance of trial counsel] claim. Here, where counsel's performance in failing to [understand basic tenets of Pennsylvania criminal law] claim seems clearly substandard under the first prong of *Strickland*, we need not concern ourselves with the prejudice prong of *Strickland* in order to satisfy *Martinez* and excuse the procedural default of the [ineffective assistance of trial counsel] claim. Were the substandard performance not so clear, we might require more of a showing of harm before letting the case advance to a full-blown *Strickland* analysis."[103] As discussed below in our *Strickland* analysis, Mr. Towles had a constitutional right to counsel aware of the elements of the charged crime. Mr. Towles had a constitutional right to counsel who did not, in his closing, argue against one of the elements of his chosen defense of voluntary manslaughter. Mr. Towles had a constitutional right to counsel aware of the extremely limited allowable uses for intoxication evidence in criminal trials in Pennsylvania.

We find Mr. Towles satisfies *Martinez* and his procedural defaulted claim is excused following our Court of Appeals's guidance in *Preston*.

### C. Mr. Towles demonstrates Trial Counsel's ineffective assistance under *Strickland*.

The Commonwealth argues Trial Counsel did the best with the evidence he had and, even if he was ineffective, Mr. Towles was not prejudiced because Judge Knisely still charged the jury on third-degree murder and evidence could allow the jury to find Mr. Towles guilty of the lesser included offense of third-degree murder.

Having satisfied *Martinez*, we consider the ineffective assistance claim due to lawyer confusion against Trial Counsel.[104] Claims of ineffective assistance of counsel are evaluated under the two-prong test of *Strickland v. Washington*.[105] The Supreme Court in *Strickland* recognized

the Sixth Amendment's guarantee "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence" means defendants are entitled to be represented by an attorney who meets at least a minimal standard of competence.[106] To succeed on an ineffective assistance claim, "the petitioner must demonstrate (1) that counsel's performance was deficient, in that it fell below an objective standard of reasonableness, and (2) that the petitioner suffered prejudice as a result of the deficiency."[107]

### 1. Mr. Towles demonstrated constitutional deficiency.

The first prong—constitutional deficiency—"is necessarily linked to the practice and expectations of the legal community: 'The proper measure of attorney performance remains simply reasonableness under prevailing professional norms.'"[108] "In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances."[109] "Under *Strickland*, 'strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.'"[110]

### a. Voluntary manslaughter is a specific intent crime and evidence of intoxication does not support a voluntary manslaughter defense.

We look first to the applicable Pennsylvania state law governing Mr. Towles's conviction and then turn to an assessment of Trial Counsel's performance under the law.

The jury convicted Mr. Towles of first degree murder.[111] To sustain a conviction for first degree murder, the Commonwealth had to establish beyond a reasonable doubt (1) a person was

unlawfully killed; (2) the defendant was responsible for the killing; and (3) the defendant acted with malice and the specific intent to kill.[112]

But Judge Knisely also instructed the jury on the elements to find voluntary manslaughter: a lesser crime without the attendant possibility of being sentenced to death. "The term 'voluntary manslaughter' contemplates an intentional or voluntary act on the part of the defendant."[113] Pennsylvania law "provides for a conviction of voluntary manslaughter under two different circumstances. A person is guilty of voluntary manslaughter if, either he act[s] under a sudden and intense passion resulting from a serious provocation or if he 'knowingly and intentionally kills an individual' under the unreasonable belief that the killing was justified."[114]

We today focus on voluntary manslaughter from provocation, commonly referred to as a heat of passion voluntary manslaughter. A person commits voluntary manslaughter if, at the time of the killing, the person is acting under a sudden and intense heat of passion resulting from serious provocation by (1) the individual killed, or (2) another whom the actor endeavors to kill, but the actor negligently or accidentally causes the death of the individual killed.[115] "The ultimate test for adequate provocation remains whether a reasonable man, confronted with this series of events, became impassioned to the extent that his mind was incapable of cool reflection."[116] "'Heat of passion' includes emotions such as anger, rage, sudden resentment or terror, which renders the mind incapable of reason."[117]

Importantly for Mr. Towles's case, it is well established under Pennsylvania law a defendant invoking a heat of passion defense must concede he acted with the specific intent to kill.[118] The Pennsylvania Supreme Court held in *Commonwealth v. Butcher* in 1973 "[t]he gravamen of both first degree murder and voluntary manslaughter is the intentional inexcusable and unjustified killing of a human being. Both crimes require the finding of a specific intent to kill

and are thereby distinguished from [third] degree murder."[119] The Pennsylvania Supreme Court four years later in *Commonwealth v. Mason* reiterated its holding in *Butcher* "a necessary element of both murder in the first degree and voluntary manslaughter is the specific intent to kill."[120] Two years later, in 1979, the Pennsylvania Supreme Court again held "[v]oluntary manslaughter . . . involves the specific intent to kill but, by reason of passion and provocation, contains no malice."[121] The Pennsylvania Supreme Court holds the same in the five decades since.[122] If there were any doubt the specific intent to kill remains a necessary element of voluntary manslaughter in Pennsylvania, the Pennsylvania Supreme Court held about voluntary manslaughter "[u]nder the case law, the killing must be accomplished with specific intent to bring about the victim's death" on Mr. Towles's direct appeal.[123]

Evidence of voluntary intoxication is not a complete defense to any criminal charge in Pennsylvania; such evidence may only be introduced to negate the specific intent necessary for first-degree murder and thereby reduce it to third-degree murder.[124] Evidence of voluntary intoxication cannot reduce murder of the third degree to manslaughter.[125] As the Pennsylvania Supreme Court directed in *Commonwealth v. England*, "[w]here the question of intoxication is introduced into a murder case its only effect could be to negate the specific intent to kill which is required for a finding of murder of the first degree. If intoxication does render an accused incapable of forming the necessary intent the result is to reduce the crime to a lesser degree of murder. In no event does the reduction change the character of the crime from murder to manslaughter."[126] Judge Cohill reiterated this understanding a decade ago, stating "defense counsel pursued a 'heat of passion' defense and a voluntary intoxication jury instruction would have been contradictory to such a defense because in the heat of passion Petitioner would have been provoked and responding to the provocation not overpowered and overwhelmed by alcohol."[127]

### b. Trial Counsel's misunderstood basic tenets of Pennsylvania criminal law resulting in a failure to mount a defense.

Trial Counsel's performance demonstrates he did not understand fundamental Pennsylvania criminal law in two separate ways, either of which would be sufficient for us to find deficient performance as unreasonable "under prevailing professional norms."[128] Trial Counsel's performance confirms he believed (1) specific intent was not an element of voluntary manslaughter, and (2) intoxication evidence could be introduced in support of a voluntary manslaughter defense as a "multiplier."

Trial Counsel denied Mr. Towles had the specific intent to kill, despite it being an element of his chosen defense of voluntary manslaughter. In opening arguments, Trial Counsel suggested this was not a first-degree murder case by highlighting the definition of an "intentional" killing.[129] In closing, Trial Counsel stated the Commonwealth was "suggesting that there's no other reason for this to happen other than he intended to kill this individual. That's it. Just the specific intent to kill and that's it. No other explanation exists for this. No other explanation exists. That's really what it comes down to, that's what he's saying."[130] But Trial Counsel did not complete the thought. Trial Counsel then argued Mr. Towles was drunk on the night of the incident.[131] Trial Counsel then concluded the Commonwealth "wants you to think. And that's what first degree murder is. He's gonna tell you that as he shot, he had the specific intent to kill. Fully formed specific intent to kill. Fully formed. Fully formed. That's what I want to do. That's what I want to do. Fully formed. Nothing else."[132] Trial Counsel did not complete the thought or suggest to the jury what they should find if they agreed with him there was no intent. In so doing, he argued against an essential element of the defense he was advancing.

19

Trial Counsel admitted his confusion when testifying at the first post-conviction hearing, explaining his trial strategy and his understanding of Pennsylvania law. There, when Post-Conviction Counsel asked if whether Mr. Towles was "capable of forming the specific intent to kill . . . a controlling issue with regard to heat of passion[,]" he responded: "You are asking a tough legal question now. You have to – you have to have formed the specific intent to kill with respect to first degree. You have to intend your conduct with regard to voluntary manslaughter. Other DAs will argue it's the same but I don't think it's the same."[133]

The proposition Mr. Towles lacked specific intent was, as the Pennsylvania Supreme Court described during state post-conviction proceedings in this case, "irreconcilably inconsistent with . . . the defense asserted at trial."[134]

Trial Counsel sought to establish Mr. Towles's drunkenness throughout the trial as an emotional multiplier in support of his chosen defense of voluntary manslaughter despite the Pennsylvania Supreme Court's clear instruction for five decades intoxication evidence may only be introduced in support of a third-degree murder defense.[135] Trial Counsel never mentioned the possibility of finding third-degree murder in his opening statement.[136] In fact, he never mentioned third-degree murder at any point throughout the trial because he chose a voluntary manslaughter defense, as he confirmed in his post-conviction relief testimony.[137] Nevertheless, he began by telling the jury evidence from various witnesses would establish Mr. Towles's drunkenness and he continued to focus on Mr. Towles's intoxication throughout his brief opening.[138] Throughout the trial, Trial Counsel unsuccessfully sought to establish Mr. Towles's drunkenness to the detriment of establishing other evidence.[139] Most notably, Mr. Towles sought to admit an expert report from Dr. Guzzardi detailing his drug and alcohol consumption.[140] After Judge Knisely granted the Commonwealth's motion in limine which resulted in Trial Counsel being limited to

hypotheticals, Trial Counsel then proceeded to elicit abstract expert testimony concerning intoxication, including testimony alcohol could make an individual more reactive.[141] Trial Counsel returned to this inapplicable defense in his closing when he again emphasized Mr. Towles was drunk on the night of the incident, but he did not connect this drunkenness to his chosen defense of voluntary manslaughter.[142] In sum, Trial Counsel "chose" voluntary manslaughter but offered evidence relating to intoxication.

Judge Knisely read the Pennsylvania Suggested Standard Criminal Jury Instructions on first-degree murder, third-degree murder, and voluntary manslaughter.[143] Judge Knisely instructed the jury to find Mr. Towles guilty of voluntary manslaughter, they must first find the Commonwealth proved beyond a reasonable doubt Mr. Towles "had the intent to kill."[144] And Judge Knisely instructed the jury voluntary intoxication evidence is permitted to negate the specific intent to kill and a successful defense "may reduce a murder of the first degree charge to a third degree, but no lower."[145] The jury convicted Mr. Towles of first degree murder and attempted homicide, but they were not provided an avenue to find anything else.[146]

The Commonwealth argues Trial Counsel would have preferred to pursue a third-degree murder defense but his experts would not support it so he "settled on a compromise of the only remaining defense; provocation."[147] The Commonwealth further argues "even though the evidence was insufficient to mount a direct voluntary intoxication / diminished capacity defense; Trial Counsel aptly presented the jury with the ability to find that Petitioner lacked the specific intent required for first-degree murder and garnered an instruction on voluntary intoxication."[148] Noticeably absent is an argument Trial Counsel understood the controlling law. The Commonwealth conceded this confusion—at least as to Trial Counsel's attempt to use intoxication evidence for a voluntary manslaughter defense—"arguably . . . could" amount to deficient

21

performance at oral argument.[149] The Commonwealth further conceded "if [trial counsel] do not understand their defenses and the elements of their defenses, it's certainly deficient performance."[150]

Mr. Towles argues Trial Counsel "fundamentally misunderstood Pennsylvania law regarding heat-of-passion voluntary manslaughter: he believed that it did not require a specific intent to kill."[151] Mr. Towles further argues "[t]rial counsel were ineffective for failing to conduct basic legal research on the elements of heat-of-passion voluntary manslaughter, and that failure prevented them from making an informed decision on case strategy."[152] Mr. Towles also highlighted Trial Counsel's confusion regarding allowable uses of intoxication evidence under Pennsylvania law, arguing "defense counsel attempted to fit Mr. Towles's intoxicated state into a heat of passion defense."[153] Mr. Towles argues, in sum, trial counsel's "mistakes of law were inexcusable" and his "choice of defense theory, the way in which he presented the defense, and his opening and closing arguments were far from informed strategic calculations."[154]

"An attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under *Strickland*."[155] Counsel must make an "informed choice" among possible defenses.[156] Despite *Strickland*'s mandate we give trial counsel the benefit of the doubt, our Court of Appeals has repeatedly found deficient performance where there is clear evidence trial counsel misunderstood the law.

For example, our Court of Appeals considered a 2254 petition raising ineffective assistance based on trial counsel's misunderstanding of applicable law in *Massey v. Superintendent Coal Township SCI*.[157] The Commonwealth charged Mr. Massey with "criminal homicide, carrying a firearm without a license, and recklessly endangering another person[.]"[158] "During the charge

conference at the conclusion of trial, [Mr.] Massey's trial counsel requested a jury instruction on perfect self-defense[,] . . . refused an instruction on . . . voluntary manslaughter, and requested that the jury be instructed on involuntary manslaughter instead, even after having been corrected on the law by the presiding judge and the prosecutor."[159] Trial counsel did not explain why he rejected the voluntary manslaughter instruction.[160] The jury convicted Mr. Massey of first-degree murder resulting in a mandatory sentence of life imprisonment without parole.[161] Mr. Massey exhausted his claims in Pennsylvania state court but was denied relief.[162] Mr. Massey filed a habeas petition in federal court, Judge Lenihan denied Mr. Massey's petition on timeliness and ineffective assistance grounds, and Mr. Massey appealed.[163] Our Court of Appeals began "although there is a strong presumption that counsel's performance was reasonable, an attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under *Strickland*."[164] Our Court of Appeals found deficient performance, explaining "[a]lthough competent counsel is entitled to make a strategic decision to decline a particular jury instruction, the record simply does not support a finding that trial counsel's decision in this case was based in sound strategy. Rather, a plain reading of the charge conference transcript, especially when combined with Massey's testimony about the shooting, indicates that trial counsel lacked a fundamental understanding of the essential legal differences between voluntary and involuntary manslaughter."[165] Our Court of Appeals ultimately granted Mr. Massey's 2254 petition on ineffective assistance grounds.[166]

Our Court of Appeals reviewed ineffective assistance grounds underlying a 2255 habeas petition ten years ago in *United States v. Bui*.[167] Mr. Bui moved to vacate his guilty plea due to ineffective assistance arguing his lawyer failed to understand or explain his potential sentence and the impact of his plea.[168] Judge Davis found his plea was knowing and voluntary and he had, in

his plea agreement, waived collateral attack.[169] Mr. Bui appealed arguing, among other things, "his counsel provided ineffective assistance by incorrectly advising him about the availability and applicability of the safety valve sentencing provision [.]"[170] Our Court of Appeals held the record "clearly indicate[d]" Mr. Bui's counsel "provided him with incorrect advice regarding the availability of a sentencing reduction" and "[i]n addition to Bui's statements regarding counsel's representations to him, there is the fact that counsel filed a motion pursuant to § 3553(f), the basis for which he apparently did not research until immediately before the sentencing hearing."[171] This research revealed longstanding precedent holding the section 3553(f) reductions did not apply to Mr. Bui's conviction.[172] Our Court of Appeals concluded "[c]ounsel's lack of familiarity with an eighteen-year-old precedent and his erroneous advice based on that lack of familiarity demonstrate counsel's performance fell below prevailing professional norms" required by *Strickland*.[173]

We face strikingly similar error. Trial Counsel's errors of law are plainly apparent when his performance is compared to Judge Knisely's jury instructions. And in further parallel to *Massey*, trial counsel's own record statements conclusively establish a misunderstanding of Pennsylvania law. Trial Counsel not only believed voluntary manslaughter was not a specific intent crime, but he further believed intoxication evidence could be introduced in support of a voluntary manslaughter defense as an emotional "multiplier." Like the ineffective assistance in *Bui*, Trial Counsel provided Mr. Towles with incorrect advice when he told him the best defense strategy was not a third-degree defense or even a true voluntary manslaughter heat of passion defense, but instead the best option was his own, novel, intoxication/lack of specific intent/voluntary manslaughter theory. The applicable precedents Trial Counsel should have been aware of date back to the 1970s and have been repeatedly reiterated by the Pennsylvania Supreme Court. Like in *Bui*, Trial Counsel's "lack of familiarity with [decades-old] precedent[s] and his

erroneous advice based on that lack of familiarity demonstrate counsel's performance fell below prevailing professional norms" required by the Sixth Amendment.[174]

At oral argument, the Commonwealth raised a novel argument as to why Trial Counsel's performance was not deficient in his understanding of the requisite intent for a finding of voluntary manslaughter. The Commonwealth argued there was indeed a difference between the specific intent required for a finding of first-degree murder and the intent required for voluntary manslaughter and Trial Counsel was, in fact, correct to argue against intent in his closing.[175] In support, the Commonwealth referenced the Subcommittee Note to Pennsylvania Suggested Standard Criminal Jury Instruction for Voluntary Manslaughter--Murder in Issue and the cases cited therein. After a thorough review of the issue, we reject the Commonwealth's argument as off the mark and contradicted by decades of Pennsylvania Supreme Court jurisprudence. The note to the Pennsylvania Suggested Jury Instructions for voluntary manslaughter where murder is at issue (murder is not at issue here) includes the following reflection:

> The Supreme Court has said on at least one occasion that the intent required for voluntary manslaughter is either an intent to kill or to seriously injure. See *Commonwealth v. Mason*, 378 A.2d 807 (Pa. 1977). Such a definition does lead to a nice correlation between voluntary manslaughter (committed by intention) and involuntary manslaughter (committed recklessly or by gross negligence). However, in the great majority of their decisions, the appellate courts have indicated that an intention to kill is necessary, sometimes equating the requisite mental state to the specific intent to kill in first-degree murder. See, e.g., *Commonwealth v. Carter*, 466 A.2d 1328 (Pa. 1983); *Commonwealth v. Gay*, 413 A.2d 675 (Pa. 1980); *Commonwealth v. Pitts*, 404 A.2d 1305 (Pa. 1979); *Commonwealth v. Fisher*, 493 A.2d 719. In the December 1980 version of this instruction, the intent element was described as a specific intent, i.e., a conscious and fully formed intent. The subcommittee now questions whether it is conceptually or linguistically desirable to instruct a jury that voluntary manslaughter, which may involve extreme passion, requires the same quality and level of intent as first-degree murder. Subdivision 5 now speaks simply of intent to kill, see *Commonwealth v. Fisher*, 493 A.2d 719 (holding that where manslaughter alone is charged, it is sufficient to instruct the jury that voluntary manslaughter occurs where there is a killing intended by the defendant without justification; the court also cites *Pitts* "specific intent to kill"

> definition of voluntary manslaughter). Note that the language of Crimes Code section 2503(b) [relating to "unreasonable belief killing," which is not the voluntary manslaughter theory here] suggests that the mens rea in voluntary manslaughter might be either an intentional or a knowing killing. The subcommittee has attempted to distinguish the definition of malice required for first-degree murder from the mens rea element of voluntary manslaughter."[176]

Although the Pennsylvania Suggested Jury Instructions for voluntary manslaughter list "intent" as a requisite element, Pennsylvania courts have been abundantly clear voluntary manslaughter is a specific intent crime.[177] The Subcommittee tried to "distinguish the definition of *malice* required for first-degree murder from the mens rea element of voluntary manslaughter" because they thought it would be conceptually helpful to a jury of laypeople, not because there was any real uncertainty in the intent required for voluntary manslaughter in Pennsylvania.[178] And, as a final note, this is a distinction without a difference. The Commonwealth argues this Subcommittee Note should change our analysis of Trial Counsel's performance because he was correctly highlighting a nuance in the law of criminal intent. But anyone who has read the closing argument the Commonwealth refers to knows there was nothing intentional or nuanced about trial counsel's performance. His closing is so incoherent that only general themes or concepts can be gleaned, one of which is he did not want the jury to find there was fully formed intent. To suggest Trial Counsel was making a nuanced point about degrees of intent—that he wanted the jury to find intent but only a certain kind of intent—is plainly contradicted by the garbled record before us.

An attorney's "startling ignorance of the law" in a client's case can demonstrate "a complete lack of pretrial preparation" that "puts at risk both the defendant's right to an ample opportunity to meet the case of the prosecution and the reliability of the adversarial testing process."[179] We agree with Mr. Towles Trial Counsel presented a "legally impossible defense" and Mr. Towles was prejudiced by this indisputably substandard representation.[180] We conclude

Trial Counsel's misunderstanding of fundamental Pennsylvania criminal law and resultant failure to develop and present a coherent defense strategy constitutes deficient performance under prevailing professional norms.

### 2.  Mr. Towles demonstrated prejudice.

To establish the second prong for ineffective assistance under *Strickland*—prejudice—Mr. Towles must show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."[181] This is a difficult standard for a petitioner to meet. "The prejudice prong of the *Strickland* analysis is consistent with the general 'harmless error' standard applicable to all federal habeas petitioners alleging non-structural errors."[182] In other words, "the harmless inquiry under *Brecht* is coextensive with *Strickland*'s prejudice theory."[183]

"When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."[184] "[I]f there is a reasonable probability that [Mr. Towles's] attorney would have" presented either a proper voluntary manslaughter heat of passion defense or a third-degree murder intoxication defense which "would have instilled in the jury a reasonable doubt as to [Mr. Towles's] guilt[,]" then Mr. Towles "was prejudiced by his lawyer's deficient performance and is entitled to a new trial."[185]

The Commonwealth argues there is no prejudice because there is no realistic likelihood the jury would have reached a different result and the jury receive third-degree and voluntary manslaughter instructions had they wanted to. The Commonwealth points to the jury's two questions regarding third-degree murder as evidence the jury rejected voluntary manslaughter. The

Commonwealth further argues, because Judge Knisely charged the jury on third-degree murder and the intoxication defense, Trial Counsel's attempts to shoehorn intoxication evidence into a voluntary manslaughter defense were harmless because the Judge afforded the jury with the opportunity to find third-degree on their own. Based on these reasons, the Commonwealth argues harmless error.[186]

Mr. Towles argues the error is not harmless because it had a substantial injurious effect or influence in determining the jury's verdict as the jurors asked questions about the difference between first- and third-degree murder and were, therefore, not conclusively settled on a first-degree conviction.[187] And Mr. Towles argues prejudice because even the "the Commonwealth conceded at trial that this was not your traditional first degree murder case. There's no normal premeditation, no lying in wait, no substantial planning."[188] As such, "had defense counsel provided a viable legal theory," Mr. Towles argues there is a reasonable probability the jury could have reached a different conclusion.

We are not persuaded by the Commonwealth's arguments. Trial Counsel's failure to investigate and understand the well-established law prevented him from recommending and developing a coherent defense. Had counsel understood the elements of voluntary manslaughter and the allowable uses of intoxication evidence, there is a reasonable probability he would have (a) chosen a voluntary manslaughter defense or a third-degree murder defense and pursued it or (b) pursued both defenses knowingly and explained to the jury what their options were if they agreed Mr. Towles was not guilty of first-degree murder. The issue here is not one of contradictory defenses, which is a legitimate, albeit risky, trial strategy. The issue here is one of blatant confusion and failure to meet basic professional standards for a criminal defense attorney, even for his first capital defense trial.

28

We also do not find the evidence at trial overwhelming on a first-degree murder charge, which requires the Commonwealth to prove specific intent to kill and malice. Who killed Mr. Stewart was not at issue in this case, but the events leading up to his tragic death and the motivation for the crime could have been developed at trial and the jury could have found Mr. Towles guilty of a lesser charge. In this case, which involved heavy drug and alcohol use and a violent attack just minutes before Mr. Towles shot at Mr. Stewart and Mr. Wright, there was room for defense counsel to pursue either a third-degree defense theory or a voluntary manslaughter defense theory. Because of his confusion, Trial Counsel did neither. Trial Counsel's deficient performance prejudiced Mr. Towles.

Mr. Towles is entitled to guilt-phase relief based on this fundamental ineffective assistance of counsel claim. Our finding renders it unnecessary to address Mr. Towles's remaining claims because any relief that he could obtain on them would be cumulative.[189]

## III.   Conclusion

Mr. Towles's claim based on ineffective assistance of counsel due to lawyer confusion is procedurally defaulted but we excuse the default under *Martinez* because of ineffective post-conviction relief counsel, and Mr. Towles demonstrates trial counsel's performance was ineffective under the two-pronged *Strickland* test. Trial Counsel was so confused about basic Pennsylvania criminal law he effectively chose not to present a viable defense strategy. We grant Mr. Towles's petition for habeas corpus obviating the need for us to consider his other grounds for relief.

---

[1] *Commonwealth v. Towles*, No. 2879-2010 (Ct. Common Pleas Lancaster County Oct. 23, 2012), filed at ECF 82-3 at 228, 229. *See also Commonwealth. v. Towles*, 208 A.3d 988, 1008–09 (Pa. 2019).

[2] ECF 82-3 at 229.

[3] *Id.*

[4] *Id.*

[5] ECF 82-3 at 229–30; Trial Court Transcript 116:2–10, using the pagination assigned in the original document, filed at ECFs 85-6, 85-7, and 85-8.

[6] ECF 82-3 at 230; ECF 85-6 123:5–14.

[7] ECF 82-3 at 230.

[8] *Id.*

[9] *Id.*

[10] ECF 85-6 250:2–11.

[11] *Id.* 251:12–24.

[12] ECF 82-3 at 230.

[13] *Id.*

[14] *Id.*

[15] *Id.*

[16] Post-Conviction Relief Proceeding Transcript 181:13–182:7, using the pagination assigned in the original document, filed at ECFs 85-18, 85-19, and 85-20.

[17] ECF 82-3 at 230; 18 PA. CONS. STAT. ANN. § 2501 ("(a)  Offense defined.--A person is guilty of criminal homicide if he intentionally, knowingly, recklessly or negligently causes the death of another human being. (b) Classification.--Criminal homicide shall be classified as murder, voluntary manslaughter, or involuntary manslaughter."); 18 PA. CONS. STAT. ANN. 901(a) ("(a) Definition of attempt.--A person commits an attempt when, with intent to commit a specific crime, he does any act which constitutes a substantial step toward the commission of that crime."). Evidence of voluntary intoxication may negate only the specific intent necessary for first-degree murder and thereby reduce murder of the first degree to murder of the third degree. 18 PA. CONS. STAT. ANN. § 308, *as amended*.

The Commonwealth also charged Mr. Towles with unlawful possession of a firearm but the trial court severed this charge before trial. ECF 82-3 at 230.

[18] ECF 82-3 at 231.

[19] *Id.*

[20] *Commonwealth v. Towles*, 300 A.3d 400, 403 n.2 (Pa. 2023).

[21] *Commonwealth v. Mason*, 130 A.3d 601, 628 (Pa. 2015) (quoting *Commonwealth v. Busanet*, 54 A.3d 35, 55 (Pa. 2012)) (other citations omitted).

[22] *Commonwealth v. Pitts*, 404 A.2d 1305, 1308 (Pa. 1979) (quoting *Commonwealth v. Mason*, 378 A.2d 807, 808 (Pa. 1977)).

[23] ECF 85-6 47:23–48:16.

[24] *Id.* 48:23–49:10.

[25] *Id.* 50:1–51:21.

[26] *Id.* 53:15.

[27] For example, Attorney Encarnacion spent the majority of his cross of Mr. Hunter eliciting testimony on Mr. Towles's drunkenness. *See, e.g.*, *id.* 265:11–267:7.

[28] ECF 85-7 443–55.

[29] ECF 82-3 at 240–42; ECF 85-7 443–45.

[30] ECF 82-3 at 242; ECF 85-7 443–45.

[31] ECF 85-7 478:13–479:15.

[32] *Id.* 499:17–500:14.

[33] *Id.* 501:1–5.

[34] *Id.* 501–04.

[35] *Id.* 504–05.

[36] *Id.* 507:15–20.

[37] *Id.* 508:4–5.

[38] *Id.* 526:16–556:9.

[39] *Id.* 552:23–25.

[40] *Id.* 552:10.

[41] *Id.* 547:16–18.

[42] *Id.* 555:19–556:9.

---

[43] *Id.* 560–69.

[44] *Id.* 560–62.

[45] *Id.* 562:8–12.

[46] *Id.* 562:16–569:8.

[47] ECF 82-3 at 231.

[48] Penalty Phase Transcript 144:10–20, using the pagination in the original document, filed at ECF 85-14 and 85-15.

[49] ECF 82-3 at 231.

[50] *Id.*

[51] *Id.*; ECF 85-4.

[52] ECF 85-4 at 18.

[53] *Id.* at 21.

[54] *Id.*

[55] *Id.*

[56] *Commonwealth v. Towles*, 106 A.3d 591, 596–97 (Pa. 2014). James Karl of the Lancaster County Public Defender's Office represented Mr. Towles on his direct appeal. *Id.* at 595.

[57] *Id.* at 609.

[58] *Towles v. Pennsylvania*, 574 U.S. 1193 (2015).

[59] *Commonwealth v. Towles*, No. 2879-2010 (Pa. Ct. Com. Pl. Oct. 3, 2018), filed at ECF 85-1 at 150, 151.

[60] ECF 85-1 at 151–52; *Towles*, 208 A.3d at 991.

[61] *See generally* ECF 85-1. The ineffective assistance claims were "Effectiveness of Counsel Regarding Testimony of Defendant"; "Effectiveness of Counsel Regarding Testimony of Dr. Gotlieb and Dr. Cooke During Guilt Phase"; "Effectiveness of Counsel Regarding Striking of Jurors 25 and 31"; "Effectiveness of Counsel Regarding Video Footage Taken by Robert Sanders"; and "Effectiveness of Counsel Regarding Antwain Robinson." *Id.*

[62] ECF 85-1 at 153 ("Defendant claims that advising him not to testify was unreasonable because his testimony could have further supported a finding of voluntary manslaughter in the heat of passion.").

[63] *Towles*, 208 A.3d at 993 (citation omitted).

[64] *Id.* (citation omitted)

[65] ECF 85-18 at 17:12–24.

[66] *Id.* 74:18–75:6. His private representations included family and immigration work. *Id.* 75:7–10.

[67] *Id.* 75:16–18.

[68] *Towles*, 208 A.3d at 993 (quoting ECF 85-18 111–12).

[69] ECF 85-18 149:13–23.

[70] ECF 85-1 at 150.

[71] *Towles*, 208 A.3d at 991.

[72] *Id.* at 1009.

[73] *Id.* at 1000.

[74] *Id.* at 999.

[75] ECF 5.

[76] ECFs 4, 15.

[77] ECF 23.

[78] *Towles*, 300 A.3d at 403.

[79] *Id.* at 403–04.

[80] *Id.* at 417.

[81] *Id.*

[82] ECFs 89, 91. Mr. Towles attended oral argument. ECF 88. Jessica Tsang argued for Mr. Towles and Andrew Gonzales argued for the Commonwealth. ECF 92.

[83] 28 U.S.C. § 2254(b)(1)(A).

[84] *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).

[85] *Rodland v. Superintendent of SCI Houtzdale*, No. 18-1892, 2020 WL 7385089, at *2 (3d Cir. Dec. 16, 2020) (citing *Lambert v. Blackwell*, 387 F.3d 210, 232–34 (3d Cir. 2004)).

---

[86] *Id.* (citing *McCandless v. Vaughn*, 172 F.3d 255, 261 (3d Cir. 1999)).

[87] *See* 42 PA. CONS. STAT. ANN. § 9544(b).

[88] *See* 28 U.S.C. § 2254(b)(1); *House v. Bell*, 547 U.S. 518, 522 (2006) ("Out of respect for the finality of state-court judgments federal habeas courts, as a general rule, are closed to claims that state courts would consider defaulted").

[89] *O'Sullivan*, 526 U.S. at 848. *See Greene v. Superintendent Smithfield SCI*, 882 F.3d 443, 449 (3d Cir. 2018) ("[A] federal court may not review federal claims that were procedurally defaulted in state court . . . ." (quoting *Davila v. Davis*, 582 U.S. 521, 527 (2017)).

[90] *Greene*, 882 F.3d at 449 (quoting *Davila*, 582 U.S. at 528). Petitioners may also seek to overcome a procedural default through the "'fundamental miscarriage of justice exception' . . . restricted 'to a severely confined category[] of cases in which new evidence shows 'it is more likely than not that no reasonably juror would have convicted the petitioner.'" *Id.* at 449 n.8 (quoting *McQuiggin v. Perkins*, 569 U.S. 383, 395 (2013)). To establish a "fundamental miscarriage of justice," petitioner must show actual innocence. *Schlup v. Delo*, 513 U.S. 298, 324 (1995). Because Mr. Towles has not proffered evidence of actual innocence, this exception is not at play.

[91] *Workman v. Superintendent Albion SCI*, 915 F.3d 928, 937 (3d Cir. 2019) (quoting *Martinez v. Ryan*, 566 U.S. 1, 9 (2012)).

[92] *Martinez*, 566 U.S. at 17.

[93] *Preston v. Superintendent Graterford SCI*, 902 F.3d 365, 376 (3d Cir. 2018) (quoting *Cox v. Horn*, 757 F.3d 113, 124 (3d Cir. 2014)).

[94] *Workman*, 915 F.3d at 939 (quoting *Martinez*, 566 U.S. at 17).

[95] *Preston*, 902 F.3d at 376 (citing *Strickland v. Washington*, 466 U.S. 668, 688 (1984)) (footnote omitted).

[96] *See, e.g.*, ECF 85-6 47:23–48:16 (reading the statutory definitions of first-degree murder and voluntary manslaughter in his opening).

[97] *See* discussion in Part I, *supra*.

[98] ECF 82-3 at 240–42.

[99] *See, e.g.*, ECF 85-18 111–12 (confusion regarding allowable uses of intoxication evidence in criminal trials), 149:13–23 (confusion regarding the elements of voluntary manslaughter).

[100] *See Towles*, 208 A.3d 988 (ineffective assistance for lawyer confusion not presented as a ground for habeas relief).

---

[101] *Preston*, 902 F.3d at 377.

[102] *Id.* (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003)).

[103] *Id.* at 378.

[104] Because the Pennsylvania courts did not review Mr. Towles's ineffectiveness claim, the Antiterrorism and Effective Death Penalty Act of 1996's deferential standard of review is inapplicable and our review is *de novo*. *See Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001) ("[W]hen, although properly preserved by the defendant, the state court has not reached the merits of a claim thereafter presented to a federal habeas court, the deferential standard provided by AEDPA . . . do not apply.").

[105] 466 U.S. 668.

[106] *Id.* at 685–87.

[107] *Blystone v. Horn*, 664 F.3d 397, 418 (3d Cir. 2011) (citing *Strickland*, 466 U.S. at 687).

[108] *Padilla v. Kentucky*, 559 U.S. 356, 366 (2010) (quoting *Strickland*, 466 U.S. at 688).

[109] *Strickland*, 466 U.S. at 688.

[110] *Hinton v. Alabama*, 571 U.S. 263, 274 (2014) (quoting 466 U.S., at 690–91).

[111] ECF 82-3 at 231.

[112] *Commonwealth v. Yandamuri*, 159 A.3d 503, 514 (Pa. 2017); 18 PA. CONS. STAT. § 2502.

[113] *Mason*, 378 A.2d at 808.

[114] *Commonwealth v. Weston*, 749 A.2d 458, 462 (2000) (quoting 18 PA. CONS. STAT. § 2503(a) and (b)).

[115] 18 PA. CONS. STAT. § 2503(a).

[116] *Commonwealth v. Montalvo*, 986 A.2d 84, 100 (Pa. 2009) (quoting *Commonwealth v. Thornton*, 431 A.2d 248, 252 (Pa. 1981)).

[117] *Commonwealth v. Speight*, 677 A.2d 317, 324–25 (Pa. 1996), *abrogated on other grounds by Commonwealth v. Freeman*, 827 A.2d 385 (Pa. 2003) (citing *Commonwealth v. Harris*, 372 A.2d 757, 758–59 (Pa. 1977)).

[118] *Commonwealth v. Mason*, 378 A.2d 807, 808 (Pa. 1977); 18 PA. CONS. STAT. § 2503(a).

[119] *Commonwealth v. Butcher*, 304 A.2d 150, 153 (Pa. 1973). The General Assembly introduced the third-degree murder statute in a 1974 amendment, changing what was previously called

second-degree murder to third-degree and redefining second degree murder as felony murder. 1974 PA. LAWS 213, No. 46.

[120] *Mason*, 378 A.2d at 808.

[121] *Pitts*, 404 A.2d at 1308.

[122] *Commonwealth v. Davido*, 106 A.3d 611, 634 (Pa. 2014) (quoting *Pitts*, 404 A.2d at 1308) ("Murder of the third degree is a killing done with legal malice but without specific intent to kill. Voluntary manslaughter, on the other hand, involves the specific intent to kill but, by reason of passion and provocation, contains no legal malice.")

[123] *Towles*, 208 A.3d at 999–1000 (citing *Mason*, 378 A.2d at 808).

[124] 18 PA. CONS. STAT. ANN. § 308, *as amended*; *see also Commonwealth v. Fairell*, 381 A.2d 1258, 1260 (Pa. 1977) (citing 18 PA. CONS. STAT. ANN. § 308) ("Evidence of intoxication, if believed, may operate to negate the intent necessary for conviction of murder in the first degree.").

[125] *Commonwealth v. Rumsey*, 454 A.2d 1121, 1121 (Pa. 1983) (amendment to 18 PA. CONS. STAT. § 308 prohibiting defense of voluntary intoxication is constitutional); *Com. v. Ruff*, 405 A.2d 929, 929 (Pa. 1979) ("[E]vidence of voluntary intoxication could reduce murder of the first degree to murder of the third degree, but could not reduce murder of the third degree to manslaughter.").

[126] 375 A.2d 1292, 1301 (Pa. 1977) (citations omitted); *see also Serge v. Superintendent, State Corr. Inst. at Albion*, No. 10-1152, 2012 WL 3764047, at *14 (M.D. Pa. June 1, 2012), *report and recommendation adopted*, No. 10-1152, 2012 WL 3764044 (M.D. Pa. Aug. 29, 2012) ("In Serge's murder trial, the trial judge denied Serge's request for an instruction to be given on unreasonable belief voluntary manslaughter because he believed that the trial evidence could not reasonably support a verdict for the offense. In reviewing this issue, the Superior Court stated that Serge's argument for this jury instruction was premised on his contention that he was voluntarily intoxicated at the time of the shooting, a contention that does not fall within the acceptable uses of a charge for voluntary manslaughter-imperfect self defense.").

[127] *McMahon v. Fisher*, No. 10-45, 2012 WL 3276605, at *2 (W.D. Pa. Aug. 9, 2012).

[128] *Padilla*, 559 U.S. at 366 (quoting *Strickland*, 466 U.S. at 688).

[129] ECF 85-6 47:23–48:15.

[130] ECF 85-7 501:1–5.

[131] *Id.* 504–05 ("[W]hen you are spending a lot of time here tied up like a pretzel about whether he's drunk . . . And I brought you an expert. That's what we do, what lawyers do. Well, I don't need an expert to tell you that he's drunk.").

[132] *Id.* 507:15–20.

[133] ECF 85-18 149:13–23.

[134] *Towles*, 208 A.3d at 1000 (Pa. 2019). The Pennsylvania Supreme Court further noted "conceptual problems with Appellant's arguments, tracing to the defense theory at trial." *Id.* at 999.

[135] *England*, 375 A.2d at 1301.

[136] ECF 85-6 47:23–48:16.

[137] ECF 85-18 111:22–112:8.

[138] *See e.g.*, ECF 85-6 48:23–49:10, 53:15.

[139] *See* note 27, *supra*.

[140] ECF 85-7 443–45.

[141] *Id.* 478–79.

[142] *Id.* 504–05.

[143] *Id.* 526:16–556:9.

[144] *Id.* 552:10.

[145] *Id.* 547:16–18.

[146] ECF 82-3 at 231.

[147] ECF 82-1 at 13. In its briefing and at oral argument, the Commonwealth repeatedly suggested Attorney Encarnacion was forced to switch to a voluntary manslaughter theory midstream so we cannot judge his excessive focus on intoxication evidence. But Attorney Encarnacion's opening statement was about only voluntary manslaughter with no mention of third-degree murder. His closing is strategically identical. This argument is without merit.

[148] *Id.* The Commonwealth also argued "he presented what was essentially an inconsistent defense which 'assessed in light of the information known at the time of the decisions, not in hindsight,' was 'within the wide range of reasonable professional assistance[.]'" *Id.* (quoting *Strickland*, 466 U.S. at 680, 690). The parties agree inconsistent defenses, if pursued knowingly, are allowable. We also agree guided by our Supreme Court's directive in *Mathews v. United States*. 485 U.S. 58, 61–66 (1988) (even if a criminal defendant denies elements of the charged crime, they are entitled to an entrapment instruction where there is sufficient evidence from which the jury could find entrapment).

[149] ECF 92 49:1–5.

[150] *Id.* 22:5–7.

[151] ECF 77 at 28.

[152] *Id.* at 30.

[153] ECF 16 at 38.

[154] ECF 77 at 32.

[155] *Hinton*, 571 U.S. at 274 (quoting 466 U.S. at 690–91).

[156] *Wiggins v. Smith*, 539 U.S. 510, 525 (2003).

[157] No. 19-2808, 2021 WL 2910930 (3d Cir. July 12, 2021) (not binding precedent under I.O.P.5.7).

[158] *Id.* at *1.

[159] *Id.*

[160] *Id.*

[161] *Id.*

[162] *Id.*

[163] *Id.* at *2.

[164] *Id.* at *4 (cleaned up) (first quoting *Jermyn v. Horn*, 266 F.3d 257, 282 (3d Cir. 2001); then quoting *Hinton*, 571 U.S. at 274).

[165] *Id.* at *5.

[166] *Id.* at *5–*7.

[167] 795 F.3d 363 (3d Cir. 2015).

[168] *Id.* at 365.

[169] *Id.* at 365–66.

[170] *Id.* at 366.

[171] *Id.* at 367.

[172] *Id.*

[173] *Id.* (citing *Hinton*, 571 U.S. at 273–75).

[174] 795 F.3d at 367.

[175] ECF 92 23:5–24:25.

[176] Subcommittee Note to Pennsylvania Suggested Standard Criminal Jury Instruction 15.2503A Voluntary Manslaughter—Murder in Issue.

[177] *See* discussion in Part II.C.1, *supra*.

[178] Subcommittee Note 15.2503A (emphasis added).

[179] *Kimmelman v. Morrison*, 477 U.S. 365, 385 (1986) (cleaned up) (quoting *Strickland*, 466 U.S. at 685, 688); *see also Rogers v. Superintendent Greene SCI*, 80 F.4th 458 (3d Cir. 2023) (trial counsel was ineffective where they failed to object to a judge's reprimand of a witness who had changed their testimony and counsel had failed to cross examine the witness); *Velazquez v. Superintendent Fayette SCI*, 937 F.3d 151, 161 (3d Cir. 2019) ("There is ample basis in the record to conclude that trial counsel was ignorant of the GBMI-plea procedures prescribed by Pennsylvania law. He concurred in the trial judge's suggestion that he would procure the necessary records and facilitate the requisite hearing, but failed to assure that this procedure was followed and failed to verify that the plea documents reflected the plea his client sought to enter. This falls below the performance expected of the counsel guaranteed by the Sixth Amendment."); *Lambert v. Warden Greene SCI*, 861 F.3d 459, 473 (3d Cir. 2017) (finding both trial counsel and post-conviction relief counsel were ineffective where cursory legal research into Sixth Amendment jurisprudence would have led to recognition of a Confrontation Clause violation).

Other Courts of Appeals agree. *See, e.g.*, *Cates v. United States*, 882 F.3d 731, 736 (7th Cir. 2018) ("[A] mistake of law is deficient performance."); *Phillips v. Woodford*, 267 F.3d 966, 978 (9th Cir. 2001) (quoting *Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994)) (emphasis in original) ("We have held that 'counsel must, at a minimum, *conduct a reasonable investigation* enabling him to make informed decisions about how best to represent his client.' * * * Counsel's failure to consider an alternative defense cannot be considered 'strategic' where counsel has 'failed to conduct even the minimal investigation that would have enabled him to come to an informed decision about what defense to offer[.]'"); *Marshall v. Sec'y, Flor. Dep't of Corrections*, 828 F.3d 1277, 1295 (11th Cir. 2016) (Rosenbaum, J., concurring) ("[B]asic research would have revealed the law's existence, and by objective standards, any reasonably competent attorney would have sought exclusion of the identification[. T]rial counsel's failure to do so was necessarily deficient performance under *Strickland*.").

[180] ECF 92 7:21.

[181] *Hinton*, 571 U.S. at 275 (quoting *Strickland*, 466 U.S. at 694).

[182] *Preston*, 902 F.3d at 382 (citing *Johnson v. Lamas*, 850 F.3d 119, 132 (3d Cir. 2017)).

[183] *Howard v. Horn*, 56 F. Supp. 3d 709, 732 (E.D. Pa. 2014) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

---

[184] *Strickland*, 466 U.S. at 695.

[185] *Hinton*, 571 U.S. at 276.

[186] ECFs 82, 92.

[187] ECF 92 8:8–25.

[188] *Id.* 8:5–8.

[189] *See, e.g.*, *Steele v. Beard*, 830 F. Supp. 2d 49, 54 (W.D. Pa. 2011) ("My disposition of the Mills claim and the conclusion that a writ of habeas corpus is issued with respect to Steele's capital sentence renders it unnecessary to address his remaining sentencing-phase claims; any relief he could obtain on those claims would be cumulative.").